UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| STATE OF QUINTANA ROO, | § | |
| REPUBLIC OF MEXICO | § | |
| | § | CASE NO SA10CA0763 OG |
| Plaintiff, | § | |
| vs. | § | JURY DEMAND |
| | § | |
| BP, PLC; BP AMERICA, INC.; | § | |
| BP CORPORATION NORTH AMERICA, INC.; | § | |
| BP COMPANY NORTH AMERICA, INC.; | § | |
| BP PRODUCTS NORTH AMERICA, INC.; | § | |
| BP EXPLORATION & PRODUCTION, | § | |
| INC; TRANSOCEAN, LTD.; | § | |
| TRANSOCEAN DEEPWATER, INC. | § | |
| TRANSOCEAN OFFSHORE DEEPWATER | § | |
| DRILLING, INC.; HALLIBURTON ENERGY | § | |
| SERVICES, INC.; ANADARKO PETROLEUM | § | |
| CORPORATION; and CAMERON | § | |
| INTERNATIONAL CORPORATION f/k/a | § | |
| COOPER CAMERON COOPERATION, | § | |
| Defendants. | | |

### FIRST AMENDED COMPLAINT

**COMES NOW,** The State of Quintana Roo (formally known as *Estado Libre y Soberano de Quintana Roo* and hereinafter referred to as "Quintana Roo," "State," or "Plaintiff") complaining of the Defendants named below, files this First Amended Complaint, and for causes of actions against them would respectfully show the Court as follows:

### I.
### INTRODUCTION

1.     The State of Quintana Roo, Plaintiff herein, is a sovereign state that together with other states in Mexico, comprise the Republic of Mexico ("Mexico"). Quintana Roo is located in the eastern part of the Yucatan Peninsula, and on its eastern border, Quintana Roo is bordered by the waters of the Caribbean Sea and/or Gulf of Mexico. Within the state are located popular

tourist destinations, including Cancun, Cozumel, and other sites along its coastline, as well as inland. Historically, the State of Quintana Roo and the State of Texas have shared commonality in economic and other interests, which include significant trade, tourism, and commercial activities between and through the two entities. By way of example, there is a significant volume of tourism and other commercial activities between the State of Quintana Roo and the City of San Antonio and surrounding area within this judicial district.

2.      Plaintiff Quintana Roo has an extensive coastline contiguous to the Gulf of Mexico and the Caribbean Sea on which are located innumerable resorts, hotels, tourist sites, and businesses servicing the tourist trade. Quintana Roo relies on its coastal natural resources for its long term economic well-being. Of primary importance to the State and its residents, are the tourism, eco-tourism, and fishing industries. Quintana Roo brings this against Defendants for losses, injuries, and damages arising out of the catastrophic and avoidable oil spill in the Gulf of Mexico caused by the April 20, 2010 explosion and fire aboard the Deepwater Horizon oil rig ("Deepwater Horizon"), and the resulting discharge of unprecedented volumes of crude oil into the Gulf of Mexico.

3.      The Deepwater Horizon oil rig had been drilling for oil in the Gulf of Mexico *via* a well located on the Macondo Prospect Mississippi Canyon 252 approximately 100 miles off the coast of the United States. On April 20, 2010, the Deepwater Horizon exploded and caught fire. It burned for two days before tipping into the sea and sinking. During the course of the destruction of the Deepwater Horizon, the riser pipe carrying oil to the ocean surface from below the sea floor bent and/or broke. The emergency devices, installed on the wellhead for just such a disaster, failed to seal the wellhead as they should have, leaving the wellhead spewing tens of thousands of barrels of oil into the Gulf waters each day. As a direct and proximate result of the mismanagement, omissions, and negligence which permeated Defendants' operations and

activities on and related to the Deepwater Horizon which led to the disastrous explosion and oil spill, Plaintiff has suffered and in the future will suffer severe economic, environmental, and other damages as further set forth below.

4.      For approximately three months, Defendants failed to contain and/or stop the flow of oil from the well, resulting in more than 80,000 barrels per day of crude oil leaking from the well. Much of this oil remains in huge ominous clouds under the surface of the Gulf of Mexico and threatens to devastate Plaintiff's shores. On the surface, the growing, fast-moving, foul smear was so large as to be visible from outer space and covered more than 2,100 square miles, having made landfall in Louisiana and other coastal states of the United States. Scientific studies by oceanographers from the Universidad Nacional Autonoma de Mexico demonstrate and establish that the oil slick and the underwater plume of oil released into the Gulf will also spread westward with the wind and currents towards the coastline of Quintana Roo in approximately October and November of this year.

5.      The spilled oil flowing into the Gulf of Mexico will cause and continue to cause severe damage to the environment of the Caribbean and the Gulf of Mexico, including the marine, coastal and estuarine environments. The spilled oil flowing into and floating in the Gulf of Mexico (both on the surface and below) will cause current and future harm and risks of harm to the marine life along the shores of Quintana Roo' coast and on the State's beaches, as well as to other parts of the Gulf of Mexico and/or the Caribbean.

6.      Plaintiff has relied upon and is dependent on such activities as tourism, eco-tourism, fishing and/or related and supporting activities to generate a significant part of its income and revenues. With the wellhead's prolonged gushing of tens of thousands of gallons of oil per day into the waters of the Gulf of Mexico and/or the Caribbean, Plaintiff has suffered, is suffering, and will continue to suffer serious financial losses and damages, including, but not

limited to, lost profits, incurred present and future expenses related to preventive measures and scientific studies, lost business, diminution of the tourist and related industries, and other damages and injuries.

## II.
## PARTIES

7.      The State of Quintana Roo is a sovereign state which is part of the Republic of Mexico. It is also a "foreign state" and/or a political subdivision of a foreign state as defined in 28 U.S.C. § 1603(a). The State Government of Quintana Roo has its principal place of business at Anador 22 de Enero numero 1, Palacio de Gobierno, Primer Piso, Colonia Centro, Codigo Postal 77000, Chetumal, Quintana Roo. Quintana Roo relies on the natural resources found in the Gulf of Mexico and Caribbean waters and such natural resources are now damaged and further endangered by the wrongful acts of Defendants.

8.      As a result of the events described herein, Plaintiff has suffered and will continue to suffer injuries, losses, and damages which well exceed the minimum jurisdictional amounts of this Court as further specified below.

9.      Defendant, BP, PLC is a British corporation, organized under the laws of the United Kingdom, and it is one of the largest companies in the world in the oil related industry. BP PLC has done and is doing business in the State of Texas and throughout the United States. BP, PLC does business in this judicial district, directly and/or indirectly.

10.     Defendant, BP America, Inc. is a Delaware corporation with its principal place of business in Warrenville, Illinois, but it has done and is doing business in the State of Texas and throughout the United States. BP America, Inc. is a subsidiary of BP, PLC.

11.     Defendant, BP Corporation North America, Inc. (formerly BP Amoco

4

Corporation), is an Indiana corporation with its principal place of business in Houston, Texas. This Defendant has done and is doing business in the State of Texas, including within this judicial district, and throughout the United States. BP Corporation North America, Inc. is a subsidiary of BP America, Inc.

12.     Defendant BP Company North America, Inc. is a Delaware Corporation with its principal place of business in Warrenville, Illinois, but doing business in the State of Texas (including within this judicial district) and throughout the United States. BP Company North America, Inc. is a subsidiary of BP Corporation North America, Inc.

13.     Defendant BP Products North America, Inc. is a Maryland corporation, with its principal place of business in Houston, Texas. BP Products North America, Inc. is a subsidiary of BP Company North America, Inc. This Defendant has done and is doing business in the State of Texas, including within this judicial district, and throughout the United States.

14.     BP Exploration and Production, Inc. is a Delaware corporation with its principal place of business in Houston, Texas and it has done and continues to do business within the State of Texas.

15.     Defendants, BP America, Inc., BP Corporation North America, Inc., BP Company North America, Inc., and BP Products North America, Inc., and BP Exploration and Production, Inc. are closely affiliated with, part of, and/or wholly owned subsidiaries of the global parent corporation, BP, PLC. All of these Defendants shall be referred to herein collectively as "BP".

16.     During all times relevant herein, BP held and/or holds the lease granted by the U.S. Minerals Management Services ("MMS") allowing BP to drill for oil and perform oil -

production related operations at the site of the explosion and oil spill. As of April 20, 2010, BP, in whole or in part, supervised, operated, oversaw, controlled, managed, and/or operated the oil well that is the source of the largest and most devastating marine oil spill in the history of the United States.

17.     Defendant Transocean, Ltd. is a Swiss corporation doing business in the State of Texas. Transocean, Ltd. is the world's largest offshore drilling contractor and a provider of drilling management services worldwide. This Defendant has done and is doing business in the State of Texas and throughout the United States.

18.     Defendant Transocean Deepwater, Inc. is a Delaware corporation with its principal place of business in Houston, Texas. Transocean Deepwater, Inc. is a subsidiary of Transocean, Ltd. This Defendant has done and is doing business in the State of Texas and throughout the United States.

19.     Defendant Transocean Offshore Deepwater Drilling, Inc. is a Delaware corporation with its principal place of business in Houston, Texas. Transocean Offshore Deepwater Drilling, Inc. is a subsidiary of Transocean, Ltd. Transocean is the world's largest offshore drilling contractor. This Defendant has done and is doing business in the State of Texas and throughout the United States.

20.     Defendants Transocean Deepwater, Inc. and Transocean Offshore Deepwater Drilling, Inc. are wholly owned subsidiaries of the global parent corporation, Transocean, Ltd., and all of these Defendants shall be referred to herein collectively as "Transocean".

21.     Defendant Anadarko Petroleum Corporation is engaged, in part, in the business of oil and gas exploration, development, and production, both on-shore in places which include

Texas and off-shore. It is headquartered at 1201 Lake Robbins Drive, the Woodlands Texas, 77380-1046 and does business throughout the State of Texas. Defendant Anadarko held a substantial financial interest (believed to be about twenty-five percent ownership) in the well that has spewed the oil into the Gulf. This Defendant, in whole or in part, owned, controlled, managed, supervised, and/or oversaw Deepwater Horizon and the well that is the subject of this suit.

22.     Transocean owned, and BP was leasing and operating, the Deepwater Horizon as it performed production well completion operations on the outer continental shelf off the Gulf Coast, at the site from which the massive oil spill originated.

23.     At all times material and relevant hereto, the Deepwater Horizon was owned, manned, possessed, managed, controlled, chartered, supervised, overseen, and/or operated by Transocean and/or BP.

24.     Defendant Halliburton Energy Services, Inc. ("Halliburton") is a Delaware corporation with a headquarters located in Houston, Texas. It is one of the world's largest providers of products and services to the energy industry. This Defendant conducts business activities throughout the State of Texas, including within this judicial district. With respect to the Deepwater Horizon, Halliburton activities included being engaged in the cementing operations of the well and well cap. Its activities, services, and work related to the well were ostensibly conducted with the intent and purpose of preventing any blowouts, leakage of oil, and/or the disastrous results that occurred at Deepwater Horizon.

25.     Defendant Cameron International Corporation f/k/a Cooper Cameron Corporations ("Cameron") is a Delaware Corporation with its principal place of business in

Houston, Texas. Cameron is a global provider of pressure control, processing, flow control and compression systems as well as project management and aftermarket services for the oil & gas and process industries. It employs approximately 15,000 people. Cameron manufactured and/or supplied the Deepwater Horizon's blowout preventer valves that failed to activate at the time of the explosion. The blowout preventer valves were defective because they failed to operate as intended.

**III.**
**JURISDICTION**

26.     Plaintiff incorporates by reference, *verbatim*, the allegations in Paragraphs 1 through 25, above.

27.     This Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1332(a)(4), because this matter in controversy vastly exceeds the minimum jurisdictional amount of $75,000, exclusive of interest and costs, and this case is between Plaintiff (a foreign state, as defined in 28 U.S.C. § 1603(a)) and citizens of a State or of different States.

28.     Jurisdiction is also appropriate under 28 U.S.C. Section 1331, because the claims asserted by Plaintiffs arise under the laws of the United States of America, including the laws of various states which have been declared, pursuant to 43 U.S.C. section 1331(f)(1) and 1333(a)(2), to be the law of the United States for that portion of the outer continental shelf from which the oil spill originated. Title 43 U.S.C. Section 1331(1) extends exclusive Federal jurisdiction to the outer continental shelf. Federal question jurisdiction under 28 U.S.C. § 1331 also exists by virtue of Plaintiff's claims brought herein which arise under the Oil Pollution Act of 1990.

8

29. Additionally, jurisdiction is vested and conferred by Article III, § 2 of the United States Constitution inasmuch as this case between a foreign state and the citizens of a State of the United States. This Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1332 based on diversity of citizenship and the amount in controversy.

# IV.
# VENUE.

30. Plaintiff incorporates, *verbatim,* the allegations set forth in Paragraphs 1 through 29, above. Venue in this judicial district is proper under 28 U.S.C. Section 1391(b)(1) since all Defendants "reside" in the State of Texas as the term "reside" as defined by 28 U.S.C. § 1391(c) and one or more of the Defendants "reside" within this judicial district. Alternatively, venue in this judicial district is proper under 28 U.S.C. Section 1391(a)(1) since all Defendants "reside" in the State of Texas as the term "reside" as defined by 28 U.S.C. § 1391(c) and one or more of the Defendants "reside" within this judicial district.

31. Additionally, under the Roman Code of law applicable to lawsuits of this nature in Mexico, jurisdiction in the Mexican courts would not be proper. As Mexican law provides, where a defendant or defendants are domiciled or reside outside of Mexico and their actions and omissions outside of the territory of Mexico give rise to the claims, the plaintiff is required to file suit in the country of the defendants' residence even if the damages occur within the territory of Mexico. Here, all of the defendants do business and/or reside in the State of Texas. Additionally, the actions and omissions giving rise to these claims occurred outside the territory of Mexico. Therefore, under the Mexican law applicable the nature of these claims and parties, Mexican courts would not have jurisdiction over this suit and would require it to be filed in the United States, specifically in Texas.

# V.
## FACTUAL ALLEGATIONS

32.    Plaintiff incorporates, *verbatim,* the allegations set forth in Paragraphs 1 through 31, above. Whenever it is alleged herein that a corporate or business defendant engaged in tortious conduct, omissions, or actions, it did so through its authorized agents, officers, employees, representatives, and others acting on its behalf.

33.    Deepwater Horizon was an ultra-deepwater dynamic positioned semisubmersible oil rig built in 2001. It was designed and owned by Transocean, Ltd., a predecessor, and/or a related entity of Transocean, LTD. At all times relevant herein, the Deepwater Horizon was owned, manned, possessed, managed, controlled, chartered, and/or operated by Transocean, BP, and/or other Defendants herein.

34.    On April 20, 2010, the Deepwater Horizon was in the final phases of converting the oil well from an exploratory well into a production well, which process included cementing work. Cementing is delicate work that carries the risk of a blowout or other uncontrolled release of formation fluids from the well. While Defendants were carrying out their operations and activities at the Deepwater Horizon rig, a deadly and devastating explosion occurred, and the Deepwater Horizon caught fire. The Deepwater Horizon burned uncontrollably for two days, finally sinking into the Gulf's waters on April 22, 2010. As a result of Defendants' tortious actions and omissions complained of herein, crude oil gushed from the well. The oil spewed into the Gulf's waters at a flow rate and in amounts that BP refused and failed to acknowledge and/or accurately report. From the outset, BP continuously reported to the regulatory agencies, the general public, and others that the flow rate and amounts spewing forth from its well were but a

tiny fraction of the actual rates and amounts. BP's actions in this regard had the predictable effect of lulling regulatory authorities into a more passive response and were attempts to preserve its already tarnished public image and avoid financial penalties. Such conduct and false information disseminated to the public and others had the effect of lulling others into falsely believing the environmental impact was not as severe as they would have otherwise believed and causing them to defer taking appropriate preventative and mitigating action.

35.     Although the leaking wellhead was fitted with a blowout preventer ("BOP"), a device at the top of the well designed to seal off the well in the event of a sudden pressure release exactly like the one that occurred during the Deepwater Horizon blowout, the BOP failed to activate and seal the wellhead as it should have, leaving the wellhead spewing oil into the Gulf's environmentally delicate waters. Defendants' personnel and response teams were unable to activate the valves as intended.

36.     If the BOP on the wellhead had been operational, it could have been activated right after the explosion, cutting off the flow of oil at the wellhead and limiting the spill to a minute fraction of its resulting proportions, thereby sparing Plaintiff millions of dollars in losses and damages. The BOP failed to properly operate as a result of Defendants' failure to inspect, maintain, operate, test, monitor, and/or repair the BOP.

37.     The oil that spewed out into the waters of the Gulf of Mexico from the oil well, as well as other materials and substances including chemical dispersants used in an attempt to clean up the oil, will pollute and damage the waters, property, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, marshlands, and other natural and economic resources of the State of Quintana Roo. The oil, dispersants, and other materials and substances discharged by

Defendants into the Gulf of Mexico and Caribbean will damage and continue to damage for generations to come, the waters, property, estuaries, seabed, animals plants, beaches, shorelines, coastlines, marshlands, and other natural and economic resources of the State of Quintana Roo. The oil, dispersants, and other materials and substances discharged by Defendants into the Gulf of Mexico and Caribbean will also cause harm to one of Quintana Roo's sources of potable and non-potable water since it draws and processes water from the Gulf of Mexico and/or the Caribbean Sea for use by its residents.

38.     During the days leading up to the blowout, BP, Transocean, and other Defendants were aware of numerous warning signs that an explosion or other serious malfunction of the well was imminent or highly probable. For example, pressure test results showed that there was a blockage in the lines that led to the BOP, yet workers on the rig did not take appropriate corrective, preventive, and remedial action. Other observations by Defendants' employees and representatives underscored the imminent risks compelling immediate corrective, preventive, and remedial actions. Again, Defendants knowingly and willingly disregarded these risks, electing to continue operations as usual in the face of a looming disaster.

39.     After creating havoc and destruction along the shores of the United States, the oil that spewed from the well, according to scientific evidence and analysis, will migrate westward across the Gulf of Mexico and the Caribbean, devastating, killing, and contaminating marine life as it sweeps toward the shores of Plaintiff State of Quintana Roo. Its toxic and environmentally detrimental effect will cause severe damage and injury to the eco-system of the waters off the shores of Quintana Roo, killing and contaminating fish, coral reefs, oysters, shrimp, crabs, crayfish, other marine life, and the sources of food and commerce upon which the residents of Quintana Roo and the State itself depend. The toxic and environmentally devastating oil spill

also will cause and will continue to cause severe injury to the Plaintiff's coastal waters, offshore waters, beaches, lagoons, estuaries, delicate wetlands, and intertidal zones that line the extensive coast of the State of Quintana Roo and other states in Mexico such as Tamaulipas, Tabasco, Campeche, Yucatan and Veracruz. The noxious and destructive oil will cause for decades thereafter severe damage to the habitats where birds, fish, shellfish, crustaceans, and other wildlife breed, spawn, mature, and live. Quintana Roo's sources of potable and non-potable water will also be jeopardized as a result of Defendants' actions and omissions.

40.     Such devastation from the oil spill caused by Defendants' tortious actions and omissions not only will create egregious and devastating injury to the eco-system of Plaintiff's shores and coastal waters, but it will also strike at the source of the livelihoods of Plaintiff's residents who directly or indirectly depend on such jobs as servicing, supporting, and/or supplying the tourist market and/or trade, servicing, operating, and/or supplying the hotel industry, harvesting, catching, fishing, distributing, processing, selling, and otherwise handling fish, oysters, shrimp, crayfish, crabs, and other marine related wildlife contaminated or killed as a result of the oil cloud. The impact on Plaintiff's tourist trade and resort destinations and the many people with jobs related to same will be devastating.

41.     Fishing operations in the Gulf of Mexico and/or the Caribbean have been and will be injured and damaged by the contaminating and destructive oil that has killed and tainted fish and other marine life, thus significantly reducing the quantities of fish and other marine life that can be harvested for safe human consumption. The toxic oil has and will continue to cause severe financial losses to Plaintiff. Additionally, the actual effects of the oil, along with reports of same, have adversely affected commerce and tourism. Plaintiff's residents rely on a clean Gulf of Mexico and Caribbean, sea life, clean beaches and safe navigable waters for their livelihoods.

The State and its citizens also rely heavily on tourism which is centered around its beautiful beaches, coral reefs, marine life, fishing, water sports, and other on-shore and offshore activities. All of this has been jeopardized, damaged, and severely impacted by Defendants' actions.

42.     The fire and explosion of the Deepwater Horizon, its sinking and the resulting oil spill were caused by the negligence of Defendants, which renders them liable jointly and severally to Plaintiff for all its damages.

43.     The risks of offshore drilling were and are and were well known to Defendants. Defendants knew or should have known that the work the Deepwater Horizon was performing was especially hazardous and that extra precautions were necessary. Yet, Defendants failed to take appropriate measures to prevent damage to the general public, Plaintiff, and the Gulf of Mexico's marine and coastal environments and estuarine areas, including Plaintiff's shoreline and coast. Moreover, additional safety mechanisms, technologies, and precautions were known and available to Defendants, but Defendants chose not to employ them on the Deepwater Horizon.

44.     Defendants were also negligent and wanton in their attempts and omissions in trying to plug the oil well, contain the oil, and clean up the oil disaster in manners that include the following:

A.      Failing to administer and implement the proper procedures, specifically, the well cap, to contain the flow of oil until over three months after the disaster commenced, causing and allowing the continued flow of the oil.

B.      Proceeding with the oil disaster containment and plug activities in a negligent and wanton manner, resulting in urgings from the U.S. Coast Guard that Defendants undertake quicker and more effective action.

C.      Administering large quantities of dangerous and toxic chemical dispersants in the

14

Gulf waters after being instructed by the Environmental Protection Agency to only use dispersants on "rare" occasions; and

D.      Delaying approval and implementation of protective measures.

45.     Defendants knew or should have known that their negligent, grossly negligent, willful, wanton, and/or reckless conduct would result in the oil disaster, causing past, present, and future damages to all of the shorelines and waters adjacent to the Gulf of Mexico.

46.     The past, present, and future injuries to the State were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the dangers associated with their operations.

47.     After the explosion, Defendants attempted to downplay and conceal the severity of the oil spill. Their initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of the actual leak amount of close to a hundred thousand barrels of oil per day. Moreover, Defendants were slow and incomplete in their announcements and warnings to Gulf Coast residents and business people about the severity, forecast, and trajectory of the oil spill.

48.     As a direct and proximate result of the combining and concurring negligence and wantonness of all Defendants, the State has and will continue to be damaged, including, but not limited to, in the manners delineated herein. There are many other potential effects from the oil spill that have not yet become known, and Plaintiff reserves the right to amend this Complaint once additional information becomes available.

### FIRST CAUSE OF ACTION--NEGLIGENCE

49.     Plaintiff incorporates by reference, *verbatim*, each and every allegation set forth

15

above.

50.     The blowout explosion, fire, and resulting oil spill were caused by the concurrent, joint, and combined negligence or wantoness of the Defendants. The injuries and damages suffered by Plaintiff were caused by Defendants' negligent or wanton failure to adhere to recognized standards of care.

51.     According to reports and upon information and belief, BP issued orders and adopted operating methods that greatly increased the risk of a blow-out disaster and catastrophic release of oil. Defendants knew that they were operating in a dangerous formation and under dangerous conditions which required them to substantially increase, not lessen, precautionary measures. The Defendants' conduct and activities on board and related to the Deepwater Horizon, however, reflect an effort to maximize profits and ignore dangerous risks to human life and property. Upon information and belief, Plaintiffs allege that the disaster was the result of Defendants' joint, combined, and concurrent negligence which included, but was not limited to, the following:

A.      Failing to properly maintain and/or operate the Deepwater Horizon;

B.      Operating the Deepwater Horizon in such a manner that an explosion and fire occurred onboard, causing it to sink and resulting in an oil spill;

C.      Failing to properly inspect the Deepwater Horizon to ensure that all equipment and personnel were fit for their intended purposes;

D.      Acting in a careless and negligent manner;

E.      Failing to promulgate, implement, and enforce proper rules, standards, procedures, and regulations to ensure the safe operations of the Deepwater Horizon, which would have prevented the disaster;

F.      Failing to take appropriate action to avoid or mitigate the accident;

G.     Negligent implementation of policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

H.     Failing to ensure that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

I.     Failing to timely warn;

J.     Failing to timely bring the oil release under control;

K.     Failing to provide appropriate disaster prevention equipment;

L.     Acting in a manner that justifies imposition of punitive damages;

M.     Failing and refusing to alert the members of the public, governmental regulatory agencies, governmental entities, and Plaintiff of the severity of the oil spill and the imminent harm it would cause;

N.     Inaccurate and incomplete information to the public, governmental regulatory agencies, and Plaintiff about the flow rate and volume of the spill;

O.     Failing to have on-hand and/or readily available sufficient back-up equipment, materials, personnel, vessels, means, and other necessary items to quickly and effectively respond to the oil leak;

P.     Utilizing a defective well casing that was prone to fail when under heavy pressure;

Q.     Failing to observe and effectively address dangerous and recurring problems with highly flammable gaseous compounds;

R.     Instituting risky cementing and drilling procedures and operations shortly before the deadly explosion;

S.     Accelerating drilling operations and disregarding precautionary measures and ignoring risks associated with dangerous gaseous compounds and other dangerous conditions in an effort to save money;

T.     Continuing to operate the oil well without repairing the blowout preventer even after problems and risks with its condition became known to Defendants;

U.     Failing to disclose, address, and correct the weak and/or dead battery on the blowout preventer and other problems with the blowout preventer;

V.     Insisting upon cementing procedures and other cementing related activities that were risky and likely to result in a blowout;

17

W.   Failing to observe and respond and/or ignoring significant pressure discrepancies and/or other pressure readings in key pressure tests shortly before the April 20, 2010 explosion;

X.   Failing to properly operate the Deepwater Horizon and oil well;

Y.   Failing to install a remote control acoustic switch to prevent the discharge of crude oil into the Gulf of Mexico;

Z.   Inadequate, incomplete, and negligent training of personnel, representatives, and/or agents;

aa.   Failing to respond to danger signs indicating the potential for a blowout or other accident;

bb.   Failing to marshal sufficient resources to adequately respond to the oil disaster and protect the waters, property, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, marshlands, and other natural and economic resources of the State of Quintana Roo

cc.   Failing to follow plans and specifications applicable to the design and construction of the oil well, the Deepwater Horizon, and their components;

dd.   Failing to use safety devices to arrest the flow of oil in the event of a catastrophic failure of the oil well or drilling rig;

ee.   Failing to properly design the oil well;

ff.   Using dangerous chemical dispersants of an incorrect nature, type, and amount;

gg.   Negligent, faulty, and/or deficient design and drilling of the well;

hh.   Failing to read and/or misreading pressure tests prior to the explosion;

ii.   Failure to take or make additional tests to determine the pressure of the well and/or whether the well was leaking;

jj.   Designing and operating the well with substandard, faulty, and/or deficient procedures and materials despite known risks;

kk.   Improper, faulty, and/or deficient cementing procedures and improper utilization of materials, items, and cement to do so;

ll.   Utilization of inappropriate, faulty, deficient and/or substandard materials, items, and cement to perform the cementing procedures;

mm. Negligent, faulty, and/or deficient design, application, and pumping of the cement and/or cement seal;

nn. Substandard, faulty, and/or negligent preparation, design, and implementation of the well program, including testing requirements and procedures;

oo. Utilizing a blow out preventer that was negligently designed, built, installed, repaired, maintained, modified, operated, and/or used;

pp. Utilizing a blow out preventer with one blind shear ram instead of one with two or more blind shear rams;

qq. Utilizing a type of well casing that was riskier, inappropriate, and/or not in keeping with standards;

rr. Utilizing substantially fewer centralizers to keep the casing properly positioned than were necessitated by the circumstances, known risks, industry standards, and/or conditions at the well;

ss. Failures to notice and/or ignoring that the well was flowing prior to the explosion;

tt. Failure to follow industry standards, internal guidelines, and other requirements regarding the need for further evaluation if the top of the cement was not 1,000 feet above the reservoir;

uu. Failure to observe, detect, and/or appropriately and timely address the flow of hydrocarbons into the well until the hydrocarbons were in the riser and flowing to the surface;

vv. Failure to properly monitor, oversee, instruct, guide, and/or communicate with contractors, suppliers, representatives, and/or others performing various responsibilities regarding the well;

ww. Negligent, faulty, and/or deficient decisions and/or utilization of techniques, including, but not limited to, diverting or routing the well flow to a mud-gas separator;

xx. Faulty, deficient, and/or negligent utilization of products, decision-making processes, items, procedures, substances, and/or techniques with respect to the replacement of mud with seawater;

yy. Faulty, deficient, and/or negligent design, utilization, application, installation, reliance upon, operation, maintenance, repair, and/or use of the mud-gas separator;

zz. Failure to vent gas and other well flow overboard;

19

    i.      Failure to have sufficient trained personnel, procedures, policies, communication, and/or equipment to handle an emergency such as those that led to the explosion and oil spill;

    ii.     Failures to report, record, communicate, and/or document maintenance issues with equipment, items, tools, and the blow out preventer;

    iii.    Failures to replace the batteries in the control pods of the blow out preventer;

    iv.    Faulty, deficient, and/or negligent utilization of cement slurry of a type and/or density that was inadequate for the intended purposes;

and

    v.     Such other acts and omissions as will be shown at the trial of this matter.

52.    Additionally, the injuries to Plaintiff also were caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations. Defendants' initial response to the disaster was ineffective and only intensified the damage. While Defendants were contemplating what they should do to contain the spill, tens of thousands of barrels of crude oil were gushing into the Gulf of Mexico on a daily basis. On May 10, 2010, BP's Chief Operating Officer publicly admitted that BP was woefully unprepared to mitigate the damage and address the disaster.

53.    Furthermore, Defendants also failed to institute proper oil disaster response plans to contain the catastrophic oil release resulting from the Deepwater Horizon explosion and misrepresented their capability to safely conduct offshore drilling operations and contain oil releases that might occur in connection with such operations. After the oil disaster began, BP's CEO acknowledged that the company had not been fully prepared for the deepwater oil disaster. The Defendants were also negligent and wanton in their efforts to clean up the oil and in their choice to use a highly toxic chemical in an attempt to disperse the oil.

54.    Furthermore, the disaster would not have occurred had the Defendants exercised

the high degree of care. Plaintiffs, therefore, plead the doctrine of *res ipsa loquitur.*

55.     Defendants have yet to clean up the millions of gallons of oil, dispersants, and other materials and substances discharged into the Gulf waters that will damage the waters, property, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, marshlands, and other natural and economic resources of the State of Quintana Roo. The ultimate amount of damages incurred by the State of Quintana Roo as a result of the Deepwater Horizon oil disaster is not yet ascertainable and shall be established according to the proof presented at the trial of this matter. However, the damages incurred to date for which Defendants are jointly and severally liable to Plaintiff include, but are not limited to:

A.     Expenses incurred in preparations for the oil's appearance on or in the waters, property, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, marshlands, and other natural and economic resources of the State of Quintana Roo;

B.     Expenses incurred in gathering and analyzing information necessary to monitor the oil spill and undertake appropriate actions to mitigate any damages to the waters, property, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, marshlands, and other natural and economic resources of the State of Quintana Roo;

C.     Expenses incurred in providing periodic disseminations of information regarding the oil spill to agencies and officials of the government, including the Governor of Quintana Roo;

D.     Expenses related to meetings with the Mexican Environmental Agency to assess the potential impact of the oil spill and possible preventative measures;

E.     Expenses incurred in preparing for and conducting multiple exercises and mock clean-up activities;

F.     Expenses incurred in conducting cleaning up exercises and simulations, including the purchase of tracking software, tools, special outfits, and other equipment;

G.     Expenses incurred in acquiring or making available equipment, booms, vessels, and other items necessary to address the oil spill;

H.     Damages, expenses, and other expenditures the State of Quintana Roo has incurred and will continue to incur as a result of planning for the disastrous

consequences it will face as a result of the oil spill and its efforts to mitigate or reduce same.

I.    Damages for net costs of providing increased or additional public services during or after removal activities;

J.    Other losses, damages, and injuries to be proved at trial hereof;

L.    Additional damages that Plaintiff will incur include:

i.    Past, present, and future injury to the marine life and wildlife on, along, and off the coast of the State of Quintana Roo;

ii.   Past, present, and future contamination and injury to the waters, property, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, marshlands, and other natural and economic resources of the State of Quintana Roo

iii.  Past, present, and future injury to and destruction of State resources and property located on, in and around the Gulf of Mexico and adjoining waters, rivers, and estuaries;

iv.   Past, present, and future economic losses resulting from injury to, impairment of, or destruction of State property;

v.    Past, present, and future loss of State revenues from taxes, royalties, rents, fees, or net profit shares;

vi.   Past, present, and future costs expended by the State for providing increased or additional public services to address the oil disaster and protect human health and the environment;

vii.  Past, present, and future damages associated with the long-term stigma of the oil disaster, including the loss of revenues, fees, taxes, and other amounts arising from the public's stigmatized view of the fish, shrimp, oysters, and other marine life harvested by Plaintiff's residents and/or others in the Gulf of Mexico.

viii. Loss of profits, income, taxes, fees, and revenues due to the devastating impact on the tourist, eco-tourism, and fishing industries in Quintana Roo.

ix.   Damages arising from diminished tourism.

x.    Damages, expenditures, and other financial losses it has suffered as a result of environmental clean-up efforts;

xi.   Damage to the tourist trade, eco-tourism industry, and water related sports activities, and loss of revenues, taxes, fees, income, and other monies derived therefrom.

xx. Damage and injury to one of Quintana Roo's sources of potable and non-potable water utilized by its residents, industries, and commercial activities.

## SECOND CLAIM FOR RELIEF <u>Gross Negligence</u>

56. Plaintiff incorporates by reference herein, *verbatim,* each and every allegation set forth above.

57. Defendants owed a duty to Plaintiff to exercise reasonable care in the manufacture, maintenance, and operation of the Deepwater Horizon and related activities and equipment.

58. Defendants had a heightened duty of care to all Plaintiff because of the great danger associated with deep drilling from floating platforms, and the especially high risk of blowouts during cementing work such as that Deepwater Horizon was performing at the time of the explosion.

59. Defendants breached their legal duty to Plaintiff, as well as others, failed to exercise reasonable care, and acted with reckless, willful, and wanton disregard for the property, business and well being of others, including Plaintiff, in the negligent manufacture, maintenance, and/or operation of the Deepwater Horizon.

60. Defendants knew or should have known that their wanton or reckless conduct would foreseeably result in a disastrous blowout and oil spill, causing damage to the economic interests of individuals, states, governmental entities, and businesses in the areas affected by the oil spill.

61.     As a direct and proximate result of Defendants wanton or reckless conduct, Plaintiff has suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, loss of profits, revenues, loss of income, and other economic loss.

62.     Defendants wanton or reckless conduct, as described herein, entitles Plaintiff to an award of punitive damages.

## THIRD CLAIM FOR RELIEF <u>Negligence Per Se</u>

63.     Plaintiff incorporates by reference, *verbatim*, each and every allegation set forth above.

64.     Defendants' conduct with regard to the manufacture, maintenance, and/or operation of drilling operations and oil rigs such as the Deepwater Horizon is governed by numerous state and federal laws, and permits issued under the authority of these laws.

65.     These laws and permits create statutory standards that are intended to protect and benefit Plaintiff, as well as others.

66.     Defendants' violations of these statutory standards constitute negligence *per se* under applicable tort law.

67.     Defendants' violations of these statutory standards proximately caused Plaintiff's injuries, warranting compensatory and punitive damages.

## FOURTH CLAIIM FOR RELIEF <u>(Oil Pollution Act of 1990)</u>

68.     Plaintiff hereby incorporates by reference, *verbatim*, each and every allegation set forth above.

69.    The Oil Pollution Act imposes liability upon "each responsible party for a vessel or a facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines" for the "damages . . . that result from such incident." 33 U.S.C. Section 2702.

70.    The U.S. Coast Guard has designated BP and Transocean as the responsible parties under the Federal Oil Pollution Act and may designate other Defendants as responsible parties in the future.

71.    Additionally, Section 2702(b)(2)(C) provides for the recovery of "[d]amages for subsistence use of natural resources, which shall be recoverable by any claimant who so used natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources.

72.    As a result of the disaster and Defendants' gross negligence or willful misconduct with respect to the acts and omissions alleged herein, all responsible parties have caused and are liable for the following past, present, and future expenses and damages Plaintiff has suffered, which damages are the type of damages that may be recovered pursuant to the Oil Pollution Act. Plaintiff demands compensation from Defendants in amounts to be determined by the trier of fact, said amounts to include:

A.    All removal costs incurred by the State;

B.    Damages for injury to, destruction of, loss of, or loss of use of, the State's natural resources, including the reasonable costs of assessing the damages;

C.    Damages for injury to, or economic losses resulting from destruction of, real or personal property of the State;

D.    Damages equal to the net loss of taxes, royalties, rents, fees or net profit shares due to the injury, destruction or loss of real property, personal property, or natural resources;

E.   Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources;

F.   Damages for net costs of providing increased or additional public services during or after removal activities.

73.   By virtue of the acts and omissions alleged in this Complaint, Defendants are jointly and severally liable for the aforementioned damages under the Federal Oil Pollution Act.

## FIFTH CLAIM FOR RELIEF <u>(Private Nuisance)</u>

74.   Plaintiff hereby incorporates, *verbatim*, by reference each and every allegation set forth above.

75.   Defendants' acts and omissions with respect to the release of oil, dispersants, and other materials and substances will cause and continue to cause a material, substantial and unreasonable interference with the use and enjoyment of the waters, property, estuaries, seabed, animals, plants, beaches, coral reefs, shorelines, coastlines, marshlands, and other natural and economic resources of the State of Quintana Roo. Furthermore, Defendants will cause damage and injury to same and to Plaintiff.

76.   As a direct and proximate result of Defendants' nuisance generating conduct and nuisance continuation conduct, Plaintiff has suffered loss of income and other damages.

77.   Defendants are jointly and severally liable to Plaintiff for compensatory and punitive damages in an amount to be determined by a jury.

## SIXTH CLAIM FOR RELIEF <u>(Public Nuisance)</u>

78.   Plaintiff hereby incorporates, *verbatim,* by reference each and every allegation set

forth above.

79.    The conduct of Defendants unreasonably interfered with the public health and safety.

80.    Defendants' acts and omissions with respect to the release of oil, dispersants, and other materials and substances will cause and continue to cause a material, substantial and unreasonable interference with the use and enjoyment of the waters, property, estuaries, seabed, animals, plants, beaches, shorelines, coral reefs, coastlines, marshlands, and other natural and economic resources of the State of Quintana Roo. Furthermore, Defendants have caused damage and injury to same and to Plaintiff.

81.    The conduct of Defendants caused Plaintiff to suffer particular damages distinct from the general public. As a direct and proximate result of Defendants' nuisance generating conduct and nuisance continuation conduct, Plaintiff and its citizens have suffered past, present, and future losses, by way of example, loss of income; loss of revenue for the State; expenditures of substantial amounts to combat, abate, and prepare for the oil spill;  and other damages.

82.    Defendants are jointly and severally liable to Plaintiff for compensatory and punitive damages in an amount to be determined by a jury.

83.    As a direct and proximate result of Defendants' nuisance generating conduct, Plaintiff has suffered loss of income and other damages.

**PUNITIVE DAMAGES**

84.    Defendants' foregoing actions, omissions, and gross neglect of their respective duties and responsibilities were wanton, reckless, egregious, grossly negligent, fraudulent, and/or

malicious. Accordingly, Plaintiff is entitled to recover punitive damages and/or exemplary damages.

## VII.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

A.   Past, present, and future economic and compensatory damages in amounts to be determined at trial;

B.   Punitive damages;

C.   Prejudgment and postjudgment interest at the maximum rate allowable by law;

D.   Attorneys fees and costs;

E.   Remediation costs, rehabilitation costs, and response costs;

F.   Such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate; and

F.   A trial by jury as to all Defendants.

Respectfully submitted,

**SERNA & ASSOCIATES PLLC**
By:

*/S/ Enrique G. Serna*

**Enrique G. Serna, Esq.**
SBOT 00789617
**Daniel E. Serna, Esq.**
SBOT 24046821
 20985 IH 10 West
 Serna Building
 San Antonio, Texas 78257
(210) 2280095 – Telephone
(210) 2280839 – Facsimile

**ATTORNEYS FOR PLAINTIFF**